In re MORTGAGES LTD., Debtor.

Jeffrey C. Stone, Inc. d/b/a Summit Builders, an Arizona corporation, Plaintiff,

v.

Central And Monroe, L.L.C., an Arizona limited liability company; et al., Defendants.

Summers Group, Inc. d/b/a Rexel Phoenix Electric, a corporation, Cross–Claimant/Counter–Claimant,

v.

Central and Monroe, L.L.C., an Arizona limited liability company, Cross–Defendants;

and

Jeffrey C. Stone, Inc. d/b/a Summit Builders, an Arizona corporation, Counter–Defendant

and related counterclaims and cross claims.

Bankruptcy No. 2:08–bk–07465–RJH. Adversary No. 2:09–ap–00424–RJH.

United States Bankruptcy Court, D. Arizona.

Sept. 27, 2012.

Erin E. Byrnes, Graif, Barrett & Matura, P.C., Phoenix, AZ, Julianne C. Wheeler, Sharon B. Shively, Sacks Tierney, PA, Scottsdale, AZ, for Plaintiff.

Stephen F. Banta, Law Offices of Stephen F. Banta, PLLC, Gilbert, AZ, Hillary Perkins Gagnon, Jennings, Haugh & Cunningham, Phoenix, AZ, Justin V. Niedzialek, Margaret A. Gillespie, Collins, May, Potenza, Baran & Gillespie, Phoenix, AZ, Mark R. Jewett, Scottsdale, AZ, Andy M. Kvesic, Ryley, Carlock & Applewhite, Phoenix, AZ, Adam B. Nach, Allison M. Lauritson, Lane & Nach, P.C., Phoenix, AZ, S. Gregory Jones, Ryley Carlock & Applewhite, Phoenix, AZ, Bryan A. Albue, Sherman & Howard, Phoenix, AZ, Nathaniel B. Rose, Fidelity National Law Group, Phoenix, AZ, Andrew Michael Fowler, Fowler St. Clair, Mesa, AZ, John W. Storer, III, Swenson Storer Andrews & Frazelle, Phoenix, AZ, Thomas N. Swift, II, Thomas N. Swift II, P.C., Mesa, AZ, Michael J. Holden, Holden Willits PLC, Phoenix, AZ, Scott A. Malm, Adam Lee Wilkes, Gust Rosenfeld P.L.C., Phoenix, AZ, Todd B. Tuggle, Jennings, Strouss & Salmon, P.L.C., Phoenix, AZ, Daxton R. Watson, Mack Drucker & Watson, PLLC, Phoenix, AZ, for Defendants.

Mark B. Pyper, Owens & Pyper PLC, Phoenix, AZ, for Counter-Claimant.

Karen A. Palecek, Palecek & Palecek, P.L.L.C., Scottsdale, AZ, for Counter-Defendant.

Jeffrey M. Proper, Jeffrey M. Proper, PLLC, Phoenix, AZ, for Cross Defendant.

### OPINION RE: LIEN PRIORITY

RANDOLPH J. HAINES, Bankruptcy Judge.

The issue here is whether various mechanics' lien claimants, who claim priority dating from the commencement of construction in October, 2005, have priority over a construction deed of trust that was recorded in May of 2007. The lender, Mortgages, Ltd., maintains that even if there is but a single project or "work," a mechanics' lien has priority only dating from the general contract for which the work was performed (the "separate contracts doctrine"), and that in any event Mortgages is entitled to be equitably subrogated to a prior deed of trust that was paid off and released by some of the proceeds of Mortgages' loan.

## BACKGROUND FACTS

The construction project at issue is the remodeling or refurbishment of an existing building commonly known as the Hotel Monroe. Its owner, Central and Monroe, LLC, first obtained a loan from First Commonwealth Mortgage Trust in the amount of $3.2 million, secured by a deed of trust recorded in May, 2002. In July, 2005, that loan was refinanced by an $8.5 million dollar loan provided by Mortgages Ltd., secured by a deed of trust recorded that same month. Almost $3 million of the proceeds of that loan were used to satisfy the First Commonwealth debt and obtain a release of the First Commonwealth deed of trust.

In December, 2006, the owner obtained a new loan from Choice Bank in the amount of $9.3 million. It was secured by a deed of trust recorded that same month. Approximately $7.3 million of the proceeds of the Choice loan were used to satisfy the debt to Mortgages Ltd. and obtain a release of its 2005 deed of trust.

By the time the Choice Bank deed of trust was recorded in December, 2006, however, work was already underway on the remodeling. The first general contract for this remodeling project was an October 18, 2005 contract with Contractors Abate-

ment Services, Inc. ("CASI") for demolition and asbestos abatement. On October 12, 2006, the owner signed a second general contract for the remodeling project, this time with KGM Builders, Inc. ("KGM"), who is one of the mechanics' lien claimants asserting priority in this case. KGM then entered into a subcontract for CASI to continue its asbestos abatement work. The principal of KGM, Kevin Markham, was also hired by the owner to act as the owner's representative for all facets of the renovation project. As early as May, 2007, the owner and Markham recognized that a larger general contractor would be required once the renovation plans were finalized, and had identified Jeffrey C. Stone, Inc., dba Summit Builders ("Summit") as that general contractor. Summit began work on the demolition and renovation in October, 2007, and finalized its Cost Plus form of construction contract with the owner on December 12, 2007, for a cost plus budgeted amount in excess of $27.7 million. While work continued, the parties waited until a permitted set of construction plans were available to sign the prime contract; the owner signed on April 9, 2008 and Summit signed on April 18, 2008.

In the meantime, while the CASI and KGM demolition and abatement work was going on, the Choice Bank debt was refinanced by another loan from Mortgages Ltd. in the amount of $75.6 million, in May, 2007. The deed of trust securing that debt was recorded on May 16, 2007. From the proceeds of this second Mortgages Ltd. loan more than $8.9 million was used to satisfy the Choice Bank debt and obtain a release of its 2006 deed of trust.

When it made its construction loan and recorded its deed of trust, Mortgages understood that it was making a "broken priority loan" because the construction work was already underway. Consequently it obtained from the owner's principals a general Indemnity Agreement and Indemnification Agreement for Mechanics' and Materialman's Liens, and it required an assignment from the owner of the owner's rights in the general contract with Summit, even though it had not yet been finalized and signed. Mortgages did not, however, require or obtain any subordination agreements from any of the general or subcontractors performing the work.

Mortgages did not have the $75.6 million necessary to fund the loan that it made to Central and Monroe. Mortgages' business plan had been to raise the necessary funds from its investors, but by May, 2007, it was already having difficulty raising as much funds as it had committed to lend. When the loan closed on May 16, 2007, Mortgages paid itself in excess of $5.4 million for a "Loan Discount," "Construction Admin. Fees," "Rev Op Fees," and a "Processing Fee." It agreed with the owner to a "delayed funding" arrangement, purportedly to reduce the owner's interest accrual but more likely because it did not have the funds to advance. That arrangement called for about $44.7 million to be funded to a "Construction Impound" account by October, 2008, and an additional $9.4 million for interest reserves by the month after that. The initial delayed funding was funded on July 13, 2007.

But by November, 2007, just as the form of contract was being finalized and Summit took over as general contractor, Mortgages already needed to withdraw funds that it had previously paid into the Construction Impound account. Mortgages agreed with the owner to "borrow" back $2.5 million that had been funded, promising to replace $1 million of those funds on 10 days' notice, another $1 million on 20 days' notice, and the full balance within 30 days of the owner's demand. Seven days after the parties agreed upon the form of the general contract with Summit, and while

Summit was performing work at the Project, the owner demanded the first $1 million to be repaid to the Construction Impound account. Mortgages never honored that demand. Instead it not only stopped funding but diverted more money from the Construction Impound account, including more than $788,000 in April, 2008 and another half million dollars in May. The owner apparently agreed to these diversions because some of that money was used to fund some of the owner's other projects. Neither KGM nor Summit was ever informed of the withdrawals and diversions from the Construction Impound account or, indeed, of the whole "delayed funding" scheme.

By the spring of 2008 the construction impound account was insufficient to pay the accruing construction costs. Summit's first two draws were paid by the owner itself because there was insufficient money in the impound account. About $1.6 million was deposited in May, sufficient to pay Summit's third draw. By June the account was empty, although Mortgages had approved draws in excess of $10 million. Mortgages' principal Scott Coles committed suicide on June 2, and Mortgages was placed into involuntary bankruptcy on June 23.

## PROCEDURAL POSTURE

This litigation was originally filed in Maricopa County Superior Court and was removed to this Court, pursuant to 28 U.S.C. § 1441, in connection with the pending bankruptcy case of Mortgages, Ltd. Rexel Phoenix Electric and some of the other subcontractors of general contractor Summit moved to remand the adversary proceeding to state court. All parties who had appeared in the action agreed that the adversary proceeding should be remanded but only after this Court ruled on the threshold "issue of lien priority," and on September 10, 2009, the Court entered an order to that effect.

After extensive discovery, pretrial motions, joint pretrial statements and trial memoranda, the priority issue was tried to the Court on August 6, 7, 8, and 9, 2012. After the filing of post-trial memoranda on August 20, the matter was taken under advisement.

## THE SEPARATE CONTRACT ISSUE

Summit claims that although it had a separate contract with the owner dating from December, 2007, the work it contracted to do was the same "work" or construction project that CASI and KGM had begun working on as early as October, 2005 and October, 2006, prior to the recordation of the second Mortgages' deed of trust in May, 2007. Indeed, Summit even entered into a subcontract with CASI for CASI to continue with the demolition and abatement work that it had begun under its own general contract and continued under its first subcontract with KGM. But Mortgages contends that even if it was the same "work" within the meaning of Arizona's mechanics' lien priority statute, Arizona Revised Statutes ("A.R.S.") § 33–992(A), a mechanics' lien cannot have a priority earlier than the general contract, so when there are successive general contracts as there are here, each of them establishes a new, later priority date for all of the subsequent work of both that general contractor and all its subcontractors.

The statutory language defining the priority of a mechanics' lien has remained virtually unchanged since it was first adopted in 1901. Currently, the statute reads, in pertinent part: "The liens provided for in this article ... are preferred to all liens, mortgages or other encumbrances upon the property attaching subsequent to

the time the labor was commenced...."[1] Mortgages contends that "the time the labor was commenced" may not be just a single date but can be multiple dates if there is more than one general contract for the labor, or if some labor is hired directly by the owner outside of any general contract. In its motion for partial summary judgment, Mortgages argued this "separate contracts doctrine" was adopted by the Arizona Supreme Court in 1932 in its decision in *Wylie*,[2] confirmed by its 1970 decision in *Wahl*,[3] and then applied by the Court of Appeals in *Woolridge*,[4] in 1981. Although the Court has already analyzed that case law in denying Mortgages' motion for summary judgment,[5] it will repeat some of that same analysis here for completeness. In addition, Mortgages now contends that two other cases, *Allied Contract*[6] and *Mayer Central*,[7] also adopt its separate contracts theory.

■ But we must begin with the statute. Prior to 1998, Arizona's statutes contained a single provision governing the date of priority of mechanics' and materialman's liens, A.R.S. § 33–992(A). It provides that the priority date is "the time the labor was commenced or the materials were commenced to be furnished." That language does not suggest that there may be different dates depending on the contract under which the labor was performed. Indeed, the court in *Wooldridge*

held that "A.R.S. § 33–992 establishes priority for *all* of the liens provided for in the article on mechanics' liens."[8] Because the priority rule hinges solely on "the time the labor was commenced," the statutory language suggests there can be only one such "time," not multiple times for different contracts. Of course it is entirely possible, as a factual matter, that when there are multiple general contracts they may provide for different "labor," perhaps on different construction projects. But when the facts are that there is but one "labor" being performed, the statutory language clearly indicates there can only be one "time" that that "labor was commenced," regardless of how many contracts governed the work.

■ The seminal case in Arizona is *Wylie*, where the Arizona Supreme Court held that "when the building, structure, or improvement has been made under a general contract," then all liens arising from work done under that contract "are upon an equal footing."[9] "The one who furnishes the last item of material or does the last work on the building, structure, or improvement is in just as good shape as the one who did the first work or furnished the first material. Their right of lien relates to the same date."[10]

There was also extensive dictum in *Wylie* indicating that labor performed under

1. A.R.S. § 33–992(A).

2. *Wylie v. Douglas Lumber Co.*, 39 Ariz. 511, 8 P.2d 256, 259 (1932).

3. *Wahl v. Sw. Sav. & Loan Ass'n*, 106 Ariz. 381, 476 P.2d 836 (1970).

4. *Wooldridge Const. Co. v. First Nat. Bank of Ariz.*, 130 Ariz. 86, 634 P.2d 13, 19–20 (1981).

5. *Jeffrey C. Stone, Inc. d/b/a Summit Builders v. Cent. and Monroe, LLC (In re Mortgages Ltd.)*, 459 B.R. 739, 745–46 (Bankr.D.Ariz. 2011).

6. *Allied Contract Buyers v. Lucero Contracting Co.*, 13 Ariz.App. 315, 476 P.2d 521 (1970).

7. *In re Mayer Cent. Bldg. Corp.*, 275 F.Supp. 873 (D.Ariz.1967).

8. *Wooldridge*, 634 P.2d at 20 (emphasis in original).

9. *Wylie v. Douglas Lumber Co.*, 39 Ariz. 511, 8 P.2d 256, 259 (1932).

10. *Id.*

separate, direct contracts with the owner would not share that same priority date, or indeed have any relation back. This dictum was based on California cases decided under a statute that also required construction contracts to be recorded. That recording requirement "therefore divided liens into two classes, those arising under a valid contract between the owner and the contractor, and those where the labor done and materials furnished were deemed to have been done and furnished at the personal instance of the owner." [11] Arizona's statute does not similarly require construction contracts to be recorded, and apparently never did. Therefore there is no similar provision in Arizona's statute that divides mechanics' "liens into two classes."

And the *Wylie* Court was very explicit that it was not deciding whether the same priority date applies to work done under a direct contract with the owner. That opinion recognized that on the facts before the court, "all of the lien claimants have become such through the general contractor." [12] Therefore the court had no occasion to determine the priority rules for liens arising either under different contracts or directly with the owner: "What the rule should be when the lienors have directly contracted with the owner and rendered services to him personally it will be time enough to decide when the facts present the question." [13]

*Wahl*[14] applied the relation-back rule of *Wylie*, and in doing so quoted extensively from *Wylie's* dictum regarding a potentially different priority rule for those contract-ing directly with the owner. But *Wahl* similarly had no occasion to decide that issue because "In the instant case the materials were furnished to the contractor, therefore, all the rights of the materialmen, including Ray Lumber, relate back to a date prior to" the recording of the mortgage, the date when each of the material men, with the exception of Ray Lumber, delivered materials.[15]

*Wooldridge* applied the relation-back principle to earthwork "when it has been performed as a part of the work required under a general contract for the construction of a building." [16] That court also emphasized that it was not deciding whether "work done under subsequent independent contractual arrangements entered into directly with the owner" [17] would share the same priority.

In the absence of statutory language that "divided liens into two classes, those arising under a valid contract between the owner and the contractor, and those where the labor done and materials furnished were deemed to have been done and furnished at the personal instance of the owner," [18] which was the basis for the California cases that gave rise to the *Wylie* dictum, there is no statutory basis to give different priority dates to any liens governed by A.R.S. § 33–992(A).

And in its post-trial memorandum, Mortgages admits that California eliminated its separate contracts doctrine by

---

**11.** *Id.* at 258–59 (quoting *Simons Brick Co. v. Hetzel*, 72 Cal.App. 1, 236 P. 357, 359 (1925)).

**12.** *Wylie*, 8 P.2d at 260.

**13.** *Id.*

**14.** *Wahl v. Sw. Sav. & Loan Ass'n*, 106 Ariz. 381, 476 P.2d 836 (1970).

**15.** *Id.* at 840.

**16.** *Wooldridge Const. Co. v. First Nat. Bank of Ariz.*, 130 Ariz. 86, 634 P.2d 13, 19–20 (App. 1981).

**17.** *Id.* at 20.

**18.** *Wylie*, 8 P.2d at 259.

amending its statutes in 1931.[19] Since then, the California statute specifies that the priority dates from the "commencement of the work of" improvement.[20]

As noted, Mortgages now argues that two other Arizona cases adopt its "separate contracts doctrine." But neither case construes the language of A.R.S. § 33–992(A) or explains how or why it requires different priority dates depending on the nature of the contractual relationship with the owner. In *Allied Contract*, the lienholder claimed a priority from the commencement of construction of "four duplexes on the property," even though its work was for "installation of water mains on the subject property," which it did not begin until three months later, after recordation of the mortgage.[21] Nothing in the opinion establishes that the lienholder's work was in fact part of the same "work" or project that consisted of the construction of the four duplexes. In the absence of any evidence to that effect, the court might have simply assumed that it was not part of the same work because it was done pursuant to a different general contract. Nothing in the opinion construes the statute or holds that it requires a different priority date for commencement of the same work simply because there were multiple general contracts. And the *Mayer*

*Central* case[22] is even less enlightening, because it similarly fails to construe the language of the statute or provide any rationale or statement of a legal rule or analysis that supports its holding.

If dictum were controlling, then perhaps the most definitive dictum from Arizona courts on mechanics' lien priority in the broken priority context is the Court of Appeals' explanation in its extensive opinion in the *United California Bank*[23] case in 1983, *after* all of the cases and dictum that Mortgages' relies on for its "separate contracts" theory. That case was all about a "broken priority" $25 million takeout financing of the Hyatt Regency Hotel. The opinion noted that it would be "a gross understatement" to describe the litigation as merely "protracted and hard fought at every turn," but also "intense" and the "work excellent."[24] The opinion described the basic "broken priority" problem as arising from the fact that the "owner-developer[ ] began construction with its own funds before obtaining interim construction financing. A.R.S. § 33–992 provides that mechanics' and materialmen's liens will relate back to the date construction commences rather than to the time of actual filing and will, therefore, have automatic priority over a subsequent-

---

**19.** *K. & K. Brick Co. v. Brooke,* 118 Cal.App. 192, 5 P.2d 49, 50–51 (1931); Charles Evans Goulden, et al., *California Mechanics' Liens,* 51 Cal. L.Rev. 331, 341 n. 74 (1963) ("Prior to a change of law in 1931, the lien dated from the time the claimant did his work, if he did such work pursuant to a separate contact as opposed to a general contract.") (citation omitted).

**20.** The Court notes that the current version of the California Statute expressing the priority of a mechanics' lien is found at Cal. Civil Code § 8450 (2012). Pursuant to the historical notes for this statute, the section was renumbered by the 2010 additions, which became

effective July 1, 2012. The current version is a restatement of former Cal. Civil Code § 3134 (1969) without substantive change.

**21.** *Allied Contract Buyers v. Lucero Contracting Co.,* 13 Ariz.App. 315, 476 P.2d 521, 522–23 (1970).

**22.** *In re Mayer Cent. Bldg. Corp.,* 275 F.Supp. 873 (D.Ariz.1967).

**23.** *United Cal. Bank v. The Prudential Ins. Co. of Am.,* 140 Ariz. 238, 681 P.2d 390 (App. 1983).

**24.** *Id.* at 398.

ly recorded deed of trust."[25] The extremely thorough opinion saw no need to describe the mechanics' lien priority that creates the broken priority problem as arising only when there is only one general contract and no one does any work directly for the owner. That may have been dictum because there may have been no direct contracts with the owner, but even as dictum it is as authoritative as the older dictum Mortgages relies on.

■ But while there is no definitive authority expressly adopting the "separate contracts" theory after it was repealed by California in 1931, the Arizona Legislature conclusively indicated it did not generally apply by adopting that rule only for the special circumstance of site preparation work that is not governed by a general contract. The mechanics' lien statute was amended in 1998 to add new paragraph E. The new provision applies only to defined site preparation work and provides that when such work is not included in a general contract for the construction of a building or other structure, then the site improvement "is a separate work" and the mechanics' liens arising from such work have their own priority.

All parties here agreed that the demolition, abatement and renovation of the Hotel Monroe was not such site preparation and is not governed by A.R.S. § 33–992(E). But for three reasons that paragraph making a special rule for separate site preparation general contracts confirms that for vertical construction contracts, there is no "separate contracts doctrine."

First, the new paragraph specifically defines such site preparation, when not included in a construction contract, to be a "separate work." If Mortgages' separate contract theory were the rule, the separate general contract for the site preparation would be sufficient in itself to give it its own priority. The care taken by the legislature also to define such work as a "separate work" confirms that the general rule is that the nature and identity of the "work," not the nature or singleness of the contract, governs priority. There would have been no reason for the legislature to define such site preparation work as a "separate work" if that were not otherwise determinative of priority.

■ Second, and even more importantly, there would have been no need to create a special paragraph, and a special priority rule, for such site preparation work if the law had always already embodied a "separate contracts doctrine." Paragraph E only applies when the site preparation is done pursuant to a contract that is separate from the general contract for the construction of the building. Under Mortgage's theory, the priority for that work would always have dated from the commencement of the labor pursuant to that separate site preparation contract. Paragraph E would have been entirely redundant of the general rule under paragraph A. Because the Court should not assume the legislature adopted a useless law, it must conclude that paragraph E adopts a special rule for some, particularly defined separate general contracts, those dealings only with site preparation. Such a special rule for separate site preparation contracts necessarily implies that that rule does not apply to separate vertical renovation contracts such as the work on the Hotel Monroe. These are ordinary applications of the cannons of statutory interpretation of *expressio unius est exclusio alterius*[26] and that a court should not inter-

---

25. *Id.* at 401.

26. "Under the statutory interpretive principle of *expressio unius est exclusio alterius,* when the legislature makes a requirement in one

pret a statute so as to render any portion of it redundant or meaningless surplusage.[27]

Third, the new paragraph E also confirms that priority is based on the commencement of the "improvement," not on the contract under which it is performed. The paragraph specifies that even for such site preparation work that is not included in a general construction contract, the liens "arising from work and labor ... for *each* improvement at the site shall have a *separate* priority.... A lien arising from work or labor done ... for each improvement at the site attaches to the property for priority purposes at the time labor was commenced ... pursuant to the contract between the owner and the original contractor *for that improvement* to the site." [28] In other words, paragraph E adopts the same priority rule as paragraph A has always embodied, which is on a work by work or improvement by improvement basis, rather than on a contract by contract basis. If the work is, factually, all the same improvement, then it will all have the same priority, regardless of how many site preparation general contracts govern that work.

This same project concept is also found elsewhere in Arizona's mechanics' lien statutes. The Arizona Supreme Court decision in *S.K. Drywall*[29] dealt with the date for perfecting a lien, rather than the priority date of a timely perfected lien. Liens must be filed "within one hundred twenty days after the completion of a building, structure or improvement." [30] The issue in *S.K. Drywall* was whether six buildings constituted a single project or "improvement." The court of appeals had relied on the "contractual arrangements between the parties," and the manner of construction, to conclude that the time to perfect ran from the completion of each building. The Supreme Court reversed, holding that the time runs from the completion of the "improvement," which is a "catch-all" term that refers to the subject of construction.[31] Subsequently the legislature changed that result by adding A.R.S. § 33–993(B). Since 1998 that statute provides that when the work consists of separate residential buildings, then "each building is a separate work" "without regard to whether the buildings are constructed pursuant to separate contracts or a single contract." But while the legislature changed the specific result when multiple residential buildings

provision of the statute but does not include it in another, we assume the absence of the requirement was intentional." *Sharpe v. Arizona Health Care Cost Containment Sys.*, 220 Ariz. 488, 207 P.3d 741, 749 (App.2009) (quoting *Luchanski v. Congrove*, 193 Ariz. 176, 971 P.2d 636, 639 (App.1998)).

27. "[W]e must avoid interpreting a statute so as to render any of its language mere 'surplusage,' but rather, must give meaning to 'each word, phrase, clause, and sentence ... so that no part of the statute will be void, inert, redundant, or trivial.' " *Sharpe*, 207 P.3d at 749 (quoting *Herman v. City of Tucson*, 197 Ariz. 430, 4 P.3d 973, 979 (App. 1999)).

28. A.R.S. § 33–992(E) (emphasis added).

29. *S.K. Drywall, Inc. v. Developers Fin. Group, Inc.*, 169 Ariz. 345, 819 P.2d 931 (1991).

30. A.R.S. § 33–993(A). At the time of *S.K. Drywall*, this time period was sixty days. 819 P.2d at 934. The 1998 amendments to the statute changed the time period from sixty days to one hundred twenty days. The statute further provides that if a notice of completion has been recorded, the person claiming the benefits of the statute must file their lien within sixty days after recordation of such notice. A lien is filed by recording a notice and claim of lien with the county recorder and serving the notice and claim of lien on the owner, if the owner can be found within the county.

31. *S.K. Drywall*, 819 P.2d at 934.

are being constructed, it did so by adopting the same principle that liens are governed by the nature of the "separate work," not by the existence of "separate contracts or a single contract." This strongly suggests the legislature did not intend a different concept to govern priorities as compared to perfection requirements, and to impose a distinction based on "separate contracts or a single contract" for purposes of § 33–992(A) when that statute never even mentions the word "contract."

There is no basis in the statute, as there was in California at the time of the *Wylie* dictum, to apply different priority dates for work under different contracts with the owner. Nor is there any reason to conclude that Arizona would have adopted California's interpretation after it specifically repealed that interpretation in 1932. To the contrary, the language and structure of A.R.S. § 33–992(A) all imply there is a single priority date, which is the commencement of "the labor," with the sole exception under A.R.S. § 33–992(E) for liens arising under a site preparation contact that is separate from a contract for the construction of a building.

■ Of course, as noted above, it is entirely possible, on the facts, that multiple general contracts exist because they define different works or improvements. But now that there has been a trial of those facts, and much of the evidence related to the nature of the work and improvement on the Hotel Monroe, those facts conclusively establish that there was but one improvement underway from October, 2005, until Mortgages ceased funding and work stopped in the summer of 2008. All of the general contractors—CASI,

KGM and Summit—were working on the same, single renovation project. Although it significantly evolved over time, there was never more than a single species—the owner did not originally set out to develop a Neanderthal and only later abandon that project to create a Homo Sapiens instead. And CASI's initial asbestos abatement work was part of that same, single renovation project. The facts are clear there was no need for asbestos abatement, and none would have been undertaken, except because of and as part of the renovation.

Thus for purposes of A.R.S. § 33–992(A), the Court finds that there was only one date on which "the labor" commenced, when CASI started work in October, 2005.

## EQUITABLE SUBROGATION

Because Mortgages' deed of trust was not recorded until May, 2007, it is junior and subordinate to the mechanics' liens whose priority date from October, 2005. To have priority over those liens, Mortgages asks the Court to apply the equitable doctrine of equitable subrogation, to give it the priority of the deed of trust that was paid and released by a portion of Mortgages' May, 2007 loan. That was the Choice Bank deed of trust that was recorded in December, 2006. But even that would not provide priority over mechanics' liens arising from labor that commenced in October, 2005. So Mortgages asserts that it can also claim equitable subrogation on behalf of Choice Bank, to be subrogated to the deed of trust that some of its loan proceeds paid off and released, the July, 2005, deed of trust in favor of Mortgages itself.

■ The law of equitable subrogation in Arizona has changed since this Court denied a motion for summary judgment in this case.[32] In *Sourcecorp,*[33] the

---

**32.** *Jeffrey C. Stone, Inc. d/b/a Summit Builders v. Cent. and Monroe, LLC (In re Mortgages* *Ltd.),* 459 B.R. 739, 741–44 (Bankr.D.Ariz. 2011).

**33.** *Sourcecorp, Inc. v. Norcutt,* 229 Ariz. 270,

Arizona Supreme Court expressly adopted the approach of the Restatement (Third) of Property: Mortgages § 7.6 (1997) and rejected any requirement of an "agreement" as a condition of equitable subrogation,[34] as some prior Arizona cases had seemed to require.[35] Now, under *Sourcecorp* and the Restatement, "[o]ne who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment."[36] The Arizona Supreme Court made clear, however, that equitable subrogation is available only "*to the extent necessary* to prevent unjust enrichment,"[37] and that it always "depends on the facts of the particular case."[38] Indeed, on the facts of that case the Court did not permit the full remedy of equitable subrogation, because it precluded the homeowner from foreclosing the now-junior priority judgment lien and instead subjected what would have been the homeowner's equity in the property to satisfaction of that lien that would have been eliminated by their ability to foreclose the mortgage to which they were subrogated.

■ Most of the trial was devoted to evidence as to whether it would be equitable to subrogate Mortgages to the prior deeds of trust, whether Mortgages had acted equitably, and whether the contractors and subcontractors would be unjustly enriched if equitable subrogation were not permitted.

The evidence conclusively established several respects in which Mortgages did not act equitably and was significantly responsible for both the financial losses and for the priority conflict with the contractors. The facts also establish that Mortgages could have provided notice sufficient to avoid the contractors from being taken advantage of, while at the same time the facts establish there was nothing the contractors could have done to avoid the losses, the priority conflict, or to give better public notice of their claimed interests. And the facts established that *Mortgages* would be unjustly enriched if equitable subrogation were applied, rather than the remedy being necessary for Mortgages' benefit to avoid the unjust enrichment of the *contractors*.

First, Mortgages knew and understood that it was making a "broken priority" loan in May, 2007. It then knew that "the labor" on the renovation of the Hotel Monroe had already begun, so it knew that all of the contractors and subcontractors had lien rights with a priority senior to the Mortgages deed of trust that was granted and recorded when the May, 2007 loan was made. While it attempted to protect itself with both title insurance and indemnity agreements, Mortgages did absolutely nothing to give any notice to the subcontractors that it would assert a priority ahead of them, based on a theory of subrogation.

Mortgages' only defense of this inequitable conduct is that the Arizona courts have held that the mere obtaining of insurance

---

274 P.3d 1204 (2012).

**34.** *Id.* at 1209, ¶ 21.

**35.** *E.g., Lamb Excavation, Inc. v. Chase Manhattan Mortg. Corp.*, 208 Ariz. 478, 95 P.3d 542, 546, ¶ 13 (App.2004); *Peterman–Donnelly Engr's & Contractors Corp. v. First Nat'l Bank of Ariz.*, 2 Ariz.App. 321, 408 P.2d 841, 845–46 (1965).

**36.** Restatement (Third) of Property: Mortgages § 7.6(a) (1997) ("Restatement").

**37.** *Sourcecorp*, 274 P.3d at 1210, ¶ 27 (quoting Restatement § 7.6(a) (emphasis supplied by Arizona Supreme Court)).

**38.** *Id.* at ¶ 29.

does not disqualify a lender from equitable subrogation, and that lack of notice of potentially intervening liens is not required.[39] While that is correct, it does not excuse someone who actually has notice not only of the conflicting lienholder's claim to priority but also that the conflicting lienholder was continuing to advance additional value from failing to *give* public notice that it would seek to defeat that priority by asserting equitable subrogation. In none of the cases that Mortgages relies on in defense of its inaction was the conflicting lienholder continuing to advance value. It is not merely the fact that Mortgages took steps to protect itself that was inequitable; it was that was in a unique position to advise the subcontractors of their risk, and failed to do so. Indeed, the uncontradicted testimony was that it is common for lenders in such situations to specifically request subordinations from the contractors and subcontractors, which would have put them on notice of the risk, and yet Mortgages did not follow this customary practice.

Similarly, Mortgages did not give any public notice, when it recorded its own mortgage or when it released the prior Choice Bank deed of trust, that it would assert a priority based on that same deed of trust that it caused to be released of public record. The Restatement specifically authorizes the giving of such notice,[40] and yet Mortgages made absolutely no effort to provide such notice to anyone, despite its acute awareness of the problem. Indeed, it was the only party fully aware of the magnitude of the looming problem,

because it was the only party who understood that it did not have the funds that it committed to lend to finance the construction. All other parties, and particularly the contractors, were entitled to rely on the public record that reflected a $75 million deed of trust, which everyone was entitled to assume would provide sufficient funds to pay for the construction. While it is true that the evidence established that neither KGM nor Summit checked that public record, there is no dispute that they knew of and relied on Mortgages' financing. Indeed, when there were serious delays in funding Summit's draws, Mr. Markham arranged for Scott Coles to visit the site personally, hoping to expedite Mortgages' funding of the draws by convincing him the work was proceeding apace and value being added to Mortgages' collateral.

More significantly, Mortgages gave no notice when it foreclosed its deed of trust that was effectively also foreclosing its belatedly-claimed rights under one or two prior deeds of trust.

■ On these facts there is unique significance to the lender's failure to give notice of its claims and intentions. In most cases of equitable subrogation, all of the money that has been lent is already out the door. Neither of the contending parties could have done anything to mitigate their losses. Here, however, the contractors continued to incur more debt, and continued to improve Mortgages' collateral, while the public record led them to believe they had priority over the Mort-

---

39. "[T]here is no general requirement that a person seeking subrogation lack notice in order to obtain equitable relief.... We also agree with the court of appeals that it would be anomalous to deny equitable subrogation merely because a party had been diligent in obtaining title insurance." *Id.*, at 1209, ¶ 24.

40. "After performing the obligation [that the owner owed to Choice Bank], the subrogee [Mortgages] is entitled to receive upon request a formal written assignment of these [Choice Bank's] rights. Such an assignment may be placed in the public records and may be helpful in ensuring that others recognize the subrogee's [Mortgages' claimed] rights." Restatement § 7.6, cmt. a.

gages deed of trust. The contractors could have protected themselves, much like Mortgages attempted to do, by requiring the owner to post a payment bond or letter of credit to ensure they were paid. Or they could have insisted that the construction draw account be fully funded and deposited into an escrow to which they were parties. Of course that would have quickly revealed that Mortgages did not have the money to fund its promised loan, but then the contractors could have ceased work and cut their losses; instead, Mortgages' silence led them on, to their detriment and to Mortgages' advantage. "Equity aids the vigilant, not those who slumber on their rights." [41]

The Restatement, which is now the law in Arizona, specifically recognizes that this kind of delay in asserting subrogation is the primary cause for courts to find that injustice would result and therefore deny subrogation.[42] And the Restatement illustrates this situation by reference to a mechanics' lienholder who continues construction while the payor/mortgagee delays assertion of its claim to equitable subrogation.[43]

But most significantly of all, the loss to the contractors was, on all the facts established by the evidence, occasioned entirely by Mortgages' failure to fund the loan to which it had committed. There is no reason to conclude or even assume, on the facts and evidence, that the subcontractors would not have been fully paid if Mortgages had fully funded the loan to which it committed. There was, for example, no evidence that the construction was turning out to be more expensive that predicted, or would cost more than the loan amount to which Mortgages had committed. Consequently on these facts the court must conclude that the subcontractors would have been fully paid if Mortgages had fully funded its loan. Denying equitable subrogation would permit the subcontractors to recover some, but not all, that they are owed. They will still suffer substantial losses. But they certainly will not be enriched, unjustly or otherwise, compared to what they would and should have been paid if Mortgages had not breached its loan commitment and withdrawn funds from the construction loan account. They would only be paid what they were owed, but not enriched.

Mortgages has cited no case, and the Court has not located any authority, that would extend equitable subrogation to a breaching lender, and certainly not to a lender whose promised but unfulfilled loan was instrumental in inducing the investment of labor and materials by the party with the superior record lien.

Moreover, the facts are undisputed that Mortgages' benefitted itself at the expense of the contractors. First, it paid itself

---

**41.** *Irwin v. Pac. Am. Life Ins. Co.*, 10 Ariz.App. 196, 457 P.2d 736, 741 (1969).

**42.** "Since the purpose of subrogation is to prevent unjust enrichment, it will not be granted where it would produce injustice. In virtually all cases in which injustice is found, it flows from a delay by the payor in recording his or her new mortgage, in demanding and recording a written assignment, or in otherwise publicly asserting subrogation to the mortgage paid. The delay may lead the holder of an intervening interest to take detrimental action in the belief that that interest now has priority.... Even if the payor's mortgage is recorded immediately, prejudice to the holder of a junior interest can arise if the payor delays in making a demand for subrogation to that holder or seeking subrogation in the courts." Restatement § 7.6, cmt. f.

**43.** *Id.*, Illustration 30. The notes specifically indicate that Illustration 30 is based in part on the Arizona case of *Peterman–Donnelly Engr's & Contractors Corp. v. First Nat'l Bank of Ariz.*, 2 Ariz.App. 321, 408 P.2d 841 (1965).

more than $5.4 million from the initial loan funding, when it was already on notice that it would likely not be able to raise all the money it had committed to lend. Then it "borrowed" back $2.5 million of the funds it had already advanced (and did so without any notice to the contractors), and then failed to refund those amounts on demand as it had committed to do. And as the well was running completely dry, it took another $1.3 million from the account in the last two months, when it knew it could not fund as much as a tenth of the draws that it had approved. Mortgages has already been unjustly enriched by more than $9 million it received from a loan that it did not fully perform. Mortgages only response to that analysis is to note that the contractors had no direct contract with Mortgages. But the whole purpose of the law of unjust enrichment is to provide a just remedy when there is no contract, so it is no defense to an unjust enrichment analysis to argue there was no direct contractual obligations. And in any event it is Mortgages' burden to prove that the court must grant it an equitable remedy that is necessary to avoid unjust enrichment of the contractors, which Mortgages can hardly do when it has already been unjustly enriched at the expense of the contractors.

■ Mortgages also attempts to defend against this analysis by arguing that its investors—those who advanced money to fund the small portion of the loan that was funded, most of which came back to Mortgages' pockets—had no obligation to the contractors, or indeed to anyone, to fund the balance. While that may be true, it is entirely irrelevant. Mortgages' investors can claim no greater rights than

Mortgages,[44] so if Mortgages cannot carry its burden of proving that equitable subrogation is necessary to prevent the unjust enrichment of the contractors, neither can its investors.

## CONCLUSION

On these facts, equitable subrogation is not necessary to prevent unjust enrichment of the contractors and subcontractors. To the contrary, even without equitable subrogation, the contractors will be paid far less than they are justly entitled to receive for their work, and it is entirely just and proper that Mortgages should bear a substantial portion of their loss, for which it is largely responsible in at least an equitable sense. The contractors and subcontractors are therefore entitled to a lien priority dating from October, 2005, and Mortgages is entitled only to the priority dating from the recordation of its deed of trust on May 16, 2007.

Because that concludes the lien priority dispute, this adversary proceeding is remanded to Maricopa County Superior Court pursuant to this Court's order of September 10, 2009.

---

**44.** An assignee of a note and deed of trust takes only the rights and remedies of the assignor. *Cal X–Tra v. W.V.S.V. Holdings, LLC,* 229 Ariz. 377, 276 P.3d 11, 31 (App.

2012) (citing *Hunnicutt Constr., Inc. v. Stewart Title & Trust of Tucson Trust No. 3496,* 187 Ariz. 301, 928 P.2d 725, 728 (App.1996)).